DECISION AND JUDGMENT ENTRY
{¶ 1} This is an appeal from a Pickaway County Common Pleas Court, Juvenile Division, judgment that awarded Pickaway County Job and Family Services (JFS) permanent custody of Jocelyn Berkley (born November 9, 2000), Audrey Berkley (born November 7, 1998), and Colin Berkley, Jr. (born May 1, 1996).
 {¶ 2} Appellant Angela Berkley, the natural mother of the children, raises the following assignment of error:
"The lower court abused its discretion and issued a decision against the manifest weight of the evidence when it determined that a grant of permanent custody was in the best interest[s] of the minor children of the parties."
 {¶ 3} Both appellant and the children's father, Colin Berkley, Sr. are deaf. The children do not have any known hearing problems. JFS became involved in the children's lives in July of 1999, when then eight-month-old Audrey suffered a perforated bowel. How she suffered the injury is not clear. The children initially were placed in their paternal grandmother's care. Subsequently, JFS received custody and the trial court adjudicated Colin, Jr. and Audrey (Jocelyn was not yet born) dependent. In May of 2000, the children were returned to their parents' custody. On November 15, 2001, Audrey, Colin, Jr., and Jocelyn were placed in JFS's temporary custody. On November 19, 2001, JFS filed a complaint that alleged Jocelyn to be dependent, and the court subsequently adjudicated her dependent.
 {¶ 4} Over the next eighteen months, JFS provided the Berkley family with numerous services, including case planning, counseling, budgeting, meal preparation, and learning to shop for nutritious food within a budget. Over thirty different agencies were involved in helping the Berkleys. The Berkleys progressed in some areas, did not improve in others, and then regressed in the areas in which they had improved, which prompted JFS to file its June 3, 2003 permanent custody motions.
 {¶ 5} Between November 3, 2003, and December 19, 2003 the trial court held several hearings regarding the permanent custody motions. At the hearings, JFS presented evidence to show, inter alia, that the parents lack the budgeting skills necessary to provide adequate food and clothing for the children, that the children were often dirty, that the parents did not properly clean the baby bottles, and that domestic violence between the parents occurred.
 {¶ 6} Barbara J. Ogan, a teacher at A Child's Place from 1997 to 2002, worked with Colin, Jr. when he was a four-year-old and with Audrey as a three-year-old. She stated that some days when it was chilly outside they came to school without coats or wore short sleeve shirts. She often had to wash their faces and hands when they arrived. Colin, Jr. was always hungry, wanting seconds at breakfast, lunch, and snack time. He initially had problems with his speech. Audrey did not immediately interact with other children but wanted to play by herself. Because the parents are deaf, the school would communicate with them in writing. The school often did not receive responses to the notes.
 {¶ 7} Jenny Young, a teacher's aide at A Child's Place, worked with Colin, Jr. and Audrey. She stated that the children were often dirty and that she had to give Audrey a bath a couple of times and dress her in different clothes. One time she noticed bite marks on Audrey in her upper thigh region. Colin, Jr. told the teachers that his mother, appellant, bit Audrey. She stated that the children appeared hungrier than the other kids and would want seconds or thirds at lunch time. She told the children's guardian ad litem that she worried about the children because they often came to school dirty and acted withdrawn. She recalled one incident when Audrey had ink on her, and one week later it was still there.
 {¶ 8} Tiffany Dennewitz, a former teacher at A Child's Place, worked with Audrey when Audrey was two years old. She testified that Audrey usually was not very clean and that on several occasions, Audrey arrived with dirty diapers.
 {¶ 9} Lisa Tatman, a former teacher at A Child's Place, worked with Audrey and Jocelyn. She stated that the children were often dirty and that Jocelyn sometimes arrived with dirty diapers. Tatman would tell appellant to change Jocelyn's diaper before bringing her to school. Appellant sometimes would comply and then would revert to bringing Jocelyn to school with dirty diapers. Tatman also stated that the bottles appellant provided were moldy. She showed appellant how to wash the bottle on a few occasions. For a period of time, the bottles remained clean, but then they would become dirty. Tatman explained that Jocelyn had surgery to put tubes in her ears and instead of caring for her at home, the parents brought her to the daycare. The parents stated that they did not understand or were not capable of following the after-care instructions.
 {¶ 10} Tatman stated that she bought shoes for Audrey because the ones she had "were filthy and too small, and she had trouble walking because they were too small." She also bought Jocelyn a couple of outfits because her clothes were dirty. Tatman testified that one day, Jocelyn's clothes became dirty from diarrhea. Tatman changed her clothes and put the dirty clothes in a plastic bag to send home for cleaning. The next day, however, Jocelyn arrived wearing the dirty clothes — they had not been washed. Sometimes when appellant arrived to take Audrey home, appellant had to physically pick Audrey up and carry her out kicking and crying.
 {¶ 11} Tammy Icenhour, Colin, Jr.'s kindergarten teacher at Amanda Clearcreek Elementary, noticed behavioral changes in Colin, Jr. when he had visitations while in foster care. His visitations were on Wednesdays and she often noticed the changes on Thursdays. Icenhour stated that Colin, Jr. referred to his parents as Angela and Colin, not mom or dad. She explained that when she taught him, it was his second attempt at kindergarten. The first time, he had limited social abilities, speaking abilities, and was below average in academics. By the end of his second year, Colin, Jr. was one of her top five students.
 {¶ 12} Shannon Rose, one of Colin, Sr.'s friends, stated that Colin, Sr. stayed at his house in April of 2003. Rose explained an incident when Colin, Sr. attempted suicide. Mary Shaffer, someone Colin, Sr. dated, came to the house. After Mary and Colin, Sr. had some type of an argument, Colin, Sr. stabbed himself with a knife. Rose stated that Mary and Colin, Sr. often fought and engaged in violent behaviour. Rose relayed that he once commented that he thought the children were too thin because the parents used all of their money first for their own needs.
 {¶ 13} Jennifer Adkins, a volunteer at Stepping Stones Visitation Center, monitored the Berkleys' visitations for about one year. She stated that when she first started, the visitation level was "Level Two." She explained that there are three visitation levels: "Level one, the monitor is to stay in the room at all times. Level two, you would check in every fifteen to thirty minutes. Level three, not quite as often, probably every forty-five minutes." She described a typical visitation as follows: The parents "would come in, normally have their snacks, pull out the snacks, the children would start eating them. Most of the time they would start watching some type of a movie and then just sitting on the couch and eating their snacks and watching the movie." Adkins testified that instead of interacting with the children, the parents mostly just sat on the couch. She stated that after one of the children got hurt, the visitation level was increased from Level Two to Level One. When the parents started to not get along, they began having separate, one-hour visitations. Adkins testified that if the children fought, appellant just sat and did nothing; she did not discipline the children. One time, appellant got the monitor's attention to intervene and stop the children from misbehaving. Over the course of the year, Adkins did not notice any improvement in appellant's parenting skills. She stated that during the visits, she does the parenting and supervising, not appellant. Adkins also explained that sometimes the children ask how much longer until the visitation ends.
 {¶ 14} Darlene Gonez Zangara from the Ohio Resource Center on Deafness provided parental education services to the parents. She encouraged the parents to teach the children to learn sign language. She explained that deaf parents need to keep children within their vision because they cannot hear what the children might be doing behind their backs and that baby monitors are available that flash lights when a baby is crying. She worked with the Berkleys on budgeting and advised them that they could not buy whatever they wanted, but needed to prioritize their spending.
 {¶ 15} Christine M. Lowe, formerly with Ohio Resource Center on Deafness, worked with the family from August of 2000 to December of 2000. She explained that she would provide instruction one week, that the parents would appear to accept and understand it, but would not follow through. She reported that the parents "have often failed to integrate the important newly taught skills. They often deny their need to change their own behaviors. They exhibit the ability to understand and develop appropriate parenting skills." Lowe observed that the parents sometimes left the children unsupervised, either playing outside or upstairs.
 {¶ 16} Former JFS caseworker Sara O'Dell was assigned to the Berkley case in July of 2001 through June of 2003. JFS provided protective day care for the children while they were in their parents' custody so the children could work on developmental issues and socialization skills. Elaine Winter from the Pickaway County Extension Office went into the home to teach the parents how to cook. O'Dell advised the parents that before the children would be allowed to return home, they needed to know how to provide for the children's basic needs, such as food, clothing, and diapers. O'Dell testified that the parents do not have adequate parenting skills. She explained that they are not consistent in redirecting the children or in their use of discipline and that they poorly supervise the children.
 {¶ 17} Bureau of Vocational Resources vocational rehabilitation counselor Dixie Lundquist explained that she specifically counsels deaf and hard of hearing individuals to help them find employment and that she provided services to the Berkleys. She set up approximately ten interviews for Colin, Sr. and he eventually was offered a job at General Electric, located across the street from where he was living at the time. Lundquist stated that appellant did not seem motivated to work and wanted to stay home with the children. Lundquist testified that at that time the children went to daycare and appellant could have worked.
 {¶ 18} Elaine Winter from the Ohio State University Extension Family Nutrition Program worked with the Berkleys in 2000 and 2001. Winter explained that her objectives were to help the Berkleys learn how to easily prepare nutritious food for themselves and the children. She went to their home and showed them how to cook. When she first started working with them, they did not know how to use the stove. Winter stated that despite showing the Berkleys how to prepare nutritious foods on a limited budget, they did not implement what she taught them. She also stated that when she went to the home, the refrigerator was often nearly empty.
 {¶ 19} JFS Family Stability Worker Mikki Vinkovich worked with the Berkleys from August of 2001 until May of 2002. Vinkovich helped the Berkleys with budgeting, housekeeping, parenting, cooking, making grocery lists, and interacting with the children. She stated that the following agencies and organizations, among others, also attempted to help the Berkleys: (1) Early Intervention/Help Me Grow; (2) Scioto Paint Valley Mental Health Center; (3) Child Care Choices; (4) PICCA; (5) Brooks Yates; (6) the Health Department; (7) Goodwill; (8) various food pantries; (9) the WIC program; (10) a clothing center; and (11) speech and hearing centers. Vinkovich stated that the Berkleys called her when they claimed to lack food, when they received shut off notices from utility companies, and when the children needed season-appropriate clothing. She stated that when the children were removed in November of 2001, the Berkleys needed to work on budgeting, discontinuing verbal abuse, keeping the home clean, and cooking skills. Vinkovich explained that in addition to Winter's help, she and another family stability worker, Julie Baker, provided the Berkleys with a cook book, helped them prepare grocery lists, and went grocery shopping with them. Vinkovich stated that despite her efforts, the Berkleys did not use the things provided. She testified that on occasion, the Berkleys called and claimed that there was no food in the home, but when Vinkovich went to the house, she counted over 120 cans of food and at least five boxes of baby cereal. She stated that the Berkleys did not use the food they had because it was not the food that they wanted, such as Pepsi, Mountain Dew, Doritos or frozen White Castles. Vinkovich and Baker showed the Berkleys how to use the food that they had. Vinkovich went to the Berkleys' home several times each week and when she went, she did not observe anything to indicate that the Berkleys had been cooking.
 {¶ 20} Regarding the cleanliness of the home, Vinkovich stated that the bathroom was messy and that Colin, Jr.'s bedroom had a "very, very strong urine smell." She stated that his mattress was urine soaked. She observed dirty diapers spread throughout the house.
 {¶ 21} Vinkovich also testified that when the parents fought, it tended to be physical.
 {¶ 22} Vinkovich stated that in February of 2002, appellant reported to her that Colin, Sr. inappropriately looked at Audrey's vaginal area. She explained: "[Appellant] reported to myself and Julie Baker that Colin, Sr. had taken off Audrey's diaper in front of Colin, Jr. and one of Colin's friends and had pointed to her female anatomy and was explaining that there were three places and he was telling her he wanted to have anal sex with her, with [appellant]. He was showing Audrey's body to [appellant] in reference to what he wanted to do to her."
 {¶ 23} Vinkovich explained that when Colin, Jr. was ready to start kindergarten, appellant told her that she had registered him, but upon making some phone calls to the school, Vinkovich discovered that he was not registered. Thus, she and Baker registered him and bought him some clothes and school supplies.
 {¶ 24} Vinkovich stated that she received 32 "emergent need" calls from the Berkleys requesting diapers, food, formula, milk, and money to pay their utilities. Vinkovich stated that she did not see any improvement in appellant's parenting skills or her interaction with the children, and that appellant did not appear motivated to improve those skills. She did not see interaction between appellant and the children. Jocelyn was always in the playpen and Audrey was withdrawn. Vinkovich does not think the Berkleys did anything to help themselves.
 {¶ 25} Linda Barnes, Audrey and Jocelyn's foster mother, testified that the girls have been in her home for approximately two years. She explained that her daughter, whose property adjoins the Barnes' property, is Colin, Jr.'s foster mother. Barnes stated that she lives in a four-bedroom home with her husband and ten children ranging in age from twenty-one to ten months. Four of the children are her biological children and four she adopted. She explained that the whole downstairs area is a play area for the children.
 {¶ 26} Barnes stated that when Audrey and Jocelyn first arrived in her home, Audrey was somewhat withdrawn. She stated that Audrey tried to care for Jocelyn by getting her a bottle, a snack, or a diaper. Barnes thought that Audrey was used to being the caretaker. Audrey had "food issues" when she first arrived. She hoarded food and tried to eat "way more than what a little kid should have to eat." Barnes stated that Audrey worried about running out of food.
 {¶ 27} Barnes testified that Jocelyn and Audrey interact well with the other children in the home. Because Colin, Jr. lives next door, they see him everyday and play together in the back yard. Jocelyn and Audrey call her and her husband "Mom and Dad."
 {¶ 28} One time after Barnes picked Audrey and Jocelyn up from visitation, Jocelyn had red abrasions on her face and Audrey had a bump on her head. She learned that Jocelyn tumbled off of the couch when Colin, Sr. pulled his coat out from under Jocelyn and that appellant hit Audrey in the head with a toy green plastic shovel.
 {¶ 29} Carrie Beatty, Colin, Jr.'s foster mother, stated that he has been in her home for approximately two years. She lives with her husband, four biological children, three adopted children, two foster children, and her half-sister. Beatty stated that when Colin, Jr. first arrived he had "food issues." He worried whether there would be enough. She explained that when Colin, Jr. wet the bed, he would not change his clothing, even if it was wet, and he would not give her his clothes to be washed. At first, he urinated all over the floor and did not always use the toilet. Since he has been in her home, he still wets the bed on occasion, but the other problems have been resolved.
 {¶ 30} Beatty also explained that Colin, Jr. initially had some sexually inappropriate behavior. He told Beatty that she had a pretty body and would rub her arm. He exposed himself to one of the other children in the home who is two years younger than Colin, Jr. and pulled her pants down.
 {¶ 31} Beatty stated that Colin, Jr. refers to her and her husband as "Mom and Dad."
 {¶ 32} JFS Family Stability Worker Julie Baker helped the Berkleys with budgeting, food, and, parenting issues. She set up daily schedules for the family to follow so, for instance, Colin, Jr. arrived at school on time. Baker specifically scheduled how much time to allow for Colin, Jr. to get dressed, to eat breakfast, and to maybe watch a few minutes of cartoons. She scheduled when to feed the children lunch and dinner. Baker performed home visits five to eight times each week to see whether the plan was followed and often discovered that it was not. She stated that Colin, Jr. often missed his bus.
 {¶ 33} Baker testified that appellant did not interact well with the children. One example she gave is as follows:
"I can remember a time when we had gone to the food pantry * * * and we had like bags and boxes of groceries to carry in, and at the same time that we were pulling into the parking lot and parking with our supplies, PICCA was bringing the kids in from daycare, and she just goes into the house without helping anybody and sits on the couch. Finally, the baby [Jocelyn] was handed to her, she just simply puts the baby in the playpen, coat and all, nothing. No hugs, no kiss, no smile, just placed from one arm to another into the playpen."
 {¶ 34} Baker stated that when the children attempted to attract appellant's attention, "she would ignore them, you know, literally move them from her presence." Appellant instead watched television or ate food.
 {¶ 35} Baker testified that appellant had poor housekeeping skills. She stated that the house was cluttered, dirty, and had a strong odor of urine. Pop cans were everywhere, and upstairs, dirty diapers were everywhere. Baker stated that the upstairs of the Berkley home was "appalling. The smell of urine, the piles of clothes, the mattresses on the floor with no sheets and they just appear to be very stained. I didn't get real close to them." She also testified that the children had chewed on the walls.
 {¶ 36} Baker stated that a few days into the school year, she discovered that Colin, Jr. was not registered for kindergarten. JFS caseworker Erin Calder began working on the Berkley case in July of 2003. She testified that the original case plan addressed budgeting, parenting skills, alcohol and drug abuse, and the conditions of the home. Calder stated that at the time of the hearing, appellant had not made progress on her budgeting and parenting skills. Calder explained that appellant attended counseling, but failed to implement the skills. She stated that the home environment had improved, inasmuch as appellant was living in Haven House and the children were not in the home.
 {¶ 37} Calder observed appellant's visits with the children between August of 2003 and December of 2003. She described the visits as follows: "[Appellant] comes in and often brings snacks * * *. She brings, I've seen her bring videos for the kids, just put a video in and the kids just sit and watch."
 {¶ 38} The guardian ad litem, Susan Holbrook, testified that in July of 2000, she became involved in the case. She became concerned for the children because:
"[t]he house was generally cluttered. It did not smell good, there was a strong urine smell. At one time I noticed almost all the furniture was gone. The children were allowed to, as soon as anyone came to visit and the door was opened, the children were allowed to leave the apartment and go unattended out to play. When I went upstairs to look at bedrooms, they were cluttered, there was a single mattress on the floor that was urine stained. There were no bed sheets, no bed covers. There were blankets used as curtains, so the area was dark, there were two locked rooms which I was not allowed to go into. [Appellant] explained it was because they would get into things in there."
 {¶ 39} She found "uneaten dishes of food, there were baby bottles that obviously had been allowed to sit around for a while, they were moldy, there were several left-over take outs that were left on the counter and allowed to sit for quite some time. There was really nothing there in the way of the children to do. There were very few toys to keep them occupied."
 {¶ 40} When she observed the interaction between the parents and the children in the home:
"it was very little. The television was usually on and it was loud where I would request Colin, Jr. to turn it down or I would even turn it down. [Appellant] was usually watching TV or perhaps reading a magazine. The children were running around the house. And * * * if the door opened when I arrived and she let me in, the children would immediately run outside, which during the summer months I ask[ed] if I could leave the door open so I could see what was going on. After Jocelyn was born she was usually in the playpen or a bouncey [sic] chair in front of the TV."
 {¶ 41} In investigating the circumstances surrounding Audrey's perforated bowel, Holbrook received a report from Fayette County Memorial Hospital and the Fayette County Sheriff's Office. She explained:
"It was determined that [the perforated bowel] was a case of child abuse. And upon reading the information, the attending physician stated that the patient has not been eating and also has had food withheld, and has had diarrhea for the past week. Mother stated the boyfriend was withholding food and physically abusing both her and the children. It is obvious the child has not had adequate food for a prolonged period of time, that she's been ill for a prolonged period of time, particularly over the past two weeks since the mother has had the child away from the boyfriend. There is also noted to be multiple bruises about the infant's body. Mother states that the child fell off a table approximately two weeks ago. She said the child was conscious and will turn her head to spoken word and other noises, however, she does not cry and doesn't make any noises. She states that the child has waxen color, her hands and feet are cold to touch. She has bruises over the sternum, bruise on the right lower quadrant, multiple bruising on the lower extremities. She has healing abrasion over the left side of the neck. A fairly large and deep abrasion to the right anterior shoulder, which appears that was new. There is also a small bowel obstruction of the abdomen. She was found to be positive for basically blood in the bowel movements. They were giving her Tylenol for fever at that point with deciding to go on with exploratory surgery. He also states here the mother was very expressionless throughout the whole process. They decided to go ahead with the surgery to rule out the small bowel obstruction. He writes, better to thrive, probably secondary to pyloric malnutrition, suspects physical abuse, neglect and upper G.I. bleeding."
 {¶ 42} Holbrook observed the Berkleys' visitations and explained them as follows:
"[The parents] weren't always paying attention to the children. The children would leave the room * * *. It was usually myself or the monitor that would say something to them to go find the kids. At one point I was told Colin was smoking in the play ground area while he was pushing the kids on the swing. The children would continue to swing too high and neither parent would put a stop to that, even though they were told the swing set was coming out of the ground. Going in and out of rooms when they should have been in the room with a parent."
 {¶ 43} Holbrook stated that the children were initially happy to see their parents but "it didn't take too long for the attention span to die down. Colin especially would ask repeatedly, is it time to go yet. Audrey would sometimes ask if she could go and see if her other mom was there yet."
 {¶ 44} Holbrook testified that the children are comfortable in their foster homes. She opined that permanent custody is justified because:
"Watching the parents over the period of time, and all the agencies and people who have tried to help them, practically holding their hands, and them not really doing any of it on their own. They just never seemed to grasp the whole idea and to start being parents. There was never any positive outlook in all those years. If anything, one step forward, there was always several steps backwards. The constant threats of divorce of moving, that the children knew about this also, it just was an upheaval for these children. And then seeing the remarkable change from one home environment to another. I just have real concerns about moving them back into an unstable relationship. They say they're breaking up but yet they're seen together in friendly ways, they've talked about seeking an apartment again, and this is not — I just — it would just be not in their best interest to have them continually put in this ping pong type environment."
 {¶ 45} Holbrook does not think appellant's parenting skills have improved. In reaching her conclusion, she interviewed approximately forty-five people.
 {¶ 46} Dr. Christopher L. Ray, a psychologist, evaluated Colin, Sr. and appellant in May of 2003. He stated that Colin, Sr. "would not serve as an adequate custodial parent for his children. His prognosis for improvement as a parent is considered poor based upon his lack of compliance with JFS, alcohol dependency, physical abuse of his children, history of domestic violence, and inability to ensure his children's safety." Dr. Ray stated that appellant "would not serve as an adequate custodial parent for her children. Her prognosis for improvement as a parent is considered poor based on her lack of compliance with JFS, problematic behaviors during visits with he children, questionable dedication to the reunification process, and inability to ensure her children's safety. It is not likely that further supervised visits would be beneficial for [appellant] or her children." Dr. Ray more specifically explained:
"With respect to [appellant's] parenting skills, the available information indicates that [appellant] has not demonstrated that she can ensure her children's safety, and has exhibited neglectful behaviors toward her children. [Appellant] has not been able to adequately explain, for example, how Audrey was hurt while under her care. Moreover, [appellant] failed to adequately meet her children's basic needs while they resided with her, and she acknowledges that she once fell asleep when she was supposed to be watching her children. She admits that her living conditions have been poor, and blames her husband for most of her family's troubles. Although she indicates that her husband has physically abused her children, she has failed to protect them from this abuse. Furthermore, during supervised visitations, her children have complained that they have sustain injuries, and [appellant] has exhibited fighting behaviors with her husband
In addition to the aforementioned safety concerns, [appellant's] behaviors indicate a lack of dedication to the reunification process. [Appellant] has reportedly been preoccupied with the status of her relationship with her husband during recent visitations with her children. This behavior is not surprising given her dependent personality characteristics. Furthermore, she does not seem engaged with her children during visits, and has not made appropriate interventions when they have demonstrated behavioral problems.
Another concern with [appellant] is her financial situation. [Appellant] receives a fixed income, which would be reduced if she goes ahead with her divorce. [Appellant's] low income may not be sufficient to meet her children's basic needs if they are returned to the home environment."
 {¶ 47} In June of 2001, Dr. Jolie S. Brams, another psychologist, evaluated appellant. She reported that while appellant exhibits learning deficits and "likely does not learn well through pure academic instruction, such as reading and/[sic] lecturing, but this does not mean that she is unable to learn life skills to an adaptive and appropriate level."
 {¶ 48} On February 24, 2004, the trial court awarded JFS permanent custody of the three children. The court found that the children had been in JFS's temporary custody for twelve or more months of a consecutive twenty-two month period and further determined that the children could not or should not be placed with either parent within a reasonable time.
 {¶ 49} With respect to whether the children could not or should not be placed with either parent, the court noted that the parents have failed continuously and repeatedly to substantially remedy the conditions causing the children's removal.
"One of the reasons for the removal of the children was the suspicious, unexplained perforated bowel of Audrey. Additionally, there were signs of human bite marks on Audrey. While attending day care, workers at `A Child's Place' noted a consistent lack of hygiene and repeated instances of hunger of Colin, Jr. and Audrey. At times, the day care workers would have to bathe Audrey. These same workers noted dirty feeding bottles for Audrey. They also noted a lack of interaction and involvement between the children and their parents when they were dropped off at the day care facility.
When agency workers visited the Berkley home, often there was insufficient food supplies. Additionally, these workers noted unclean and unsanitary conditions in the home. The odor of urine in the home was prevalent. The children were at times observed outside unattended or supervised by either parent.
PCJFS, as well as agencies, have assisted the parents with a multitude of life skills and parenting skills. A case plan was initially established to guide and direct the parents to accomplish several goals to obtain reunification with the children. These case plan objectives included instruction in family budgeting; parenting skills; nutrition and cooking skills; couples counseling for conflict relationship of Collin, Sr. and Angela; employment services for Colin, Sr. and substance abuse counseling for Colin, Sr. Some of these services were provided with the assistance of a deaf interpreter. Many did not. The service providers noted that communication often occurred with the use of written notes between parent and provider.
The guardian ad litem has spent eight hundred to one thousand hours on the Berkley children's cases. These intensive services have taken place for almost four years. Granted, both mother and father are hearing impaired, which necessitates additional attention and services to facilitate their understanding of these necessary skills. However, neither Colin, Sr. nor Angela are strangers to the provider support system offered to hearing impaired individuals. In fact, their hearing impaired friends, who appeared in court as witnesses, testified as to the abilities that hearing impaired individuals have to achieve the desired goals of being suitable custodial parents. These witnesses state that hearing-impaired parents are capable of receiving instruction for appropriate life and parent skills.
Upon examining the current status of the parents, little progress has been made to correct the deficiencies that resulted in the removal of the children in the first place. For example, at the beginning of this case, Angela and Colin, Sr. were living together, but not married. Today, they are married, but separated, awaiting hearing on a divorce. Even at the time of the hearing, there was still no clear indication from Colin, Sr. and Angela that they deemed their relationship as terminated.
Their relationship has been a tumultuous one, with domestic violence offenses resulting in the extensive incarceration of Colin, Sr. Moreover, Colin, Sr. and Angela have significant mental health and emotional issues that are in part connected to their relationship with each other. Both Dr. Jolie Brahms and Dr. Chris Ray offered opinions that Angela is a passive, co-dependent personality. She cannot free herself from her reliance on Colin, Sr. While it is true that she has separated from him at the present and awaits a divorce, she still maintains contact with him. The poor and sometimes violent relationship between Colin, Sr. and Angela has cause life-threatening danger to each of them. Both parents have received hospital treatment for their individual attempts at suicide. Colin, Sr. in particular sustained a substantial physical injury to his arm as a result of his self-inflicted harm. There is clear and convincing evidence that the conflicted relationship between these parents creates a risk of harm to the children.
Colin, Sr. by his own admission has a significant substance abuse problem. He abuses alcohol primarily, but at times uses marijuana. He is currently in outpatient counseling treatment.
It should also be noted that Dr. Christopher Ray testified that his prognosis for either parent to improve on their parenting skills was poor. Both parents have multiple mental health disorders and conditions. In particular, Colin, Sr. evidences rather severe parenting skills, which would indicate a negative prognosis for improvement. He also testified that Angela should remain separate and apart from Colin, Sr. and committed to individual counseling.
Neither parent is employed nor has either made any significant effort to obtain or maintain employment, although the children have been out of their care since November of 2001. Both have been previously employed. Angela's counselors suggested that it is important for her to obtain some meaningful employment to build up her self-esteem. While their hearing impairedness may present some challenges, there is substantial evidence to demonstrate that their deafness does not create an impossible situation for them to be employed. In fact, other hearing impaired witnesses, some of whom were the Berkley's friends, encouraged them to gain employment. The employment counselors for the Bureau of Vocational Rehabilitation offered their assistance to the Berkleys. These efforts have not resulted in employment for either.
Both parents were offered a variety of sessions of training and instruction for nutritious meal preparation. They had providers taking them grocery shopping and in-home cooking lessons. While living together, there [sic] home was frequently stocked with food staples. However, they still purchased `junk food' and did not use the healthy nutritious food that remained in abundance on their shelves for the children or themselves. Additionally, they attempted to obtain more food from the Emergency Clearinghouse and Food Pantries, when it wasn't necessary.
Upon examining the evidence, it is clear and convincing that monumental efforts have been made to assist the Berkleys in remedying the conditions which were the cause of the initial removal of the children. The fact that they may have made some recent changes, which improved their own position in life, does not necessarily mean that permanent custody should not be awarded. * * * Moreover, even though a parent may have diligently completed a case plan, a permanent custody order may still be awarded where a stable home environment has not been established."
 {¶ 50} The court thus concluded that despite reasonable case planning and diligent efforts to remedy the problems that initially led to the children's removal, the parents have failed continuously over the last two years to substantially remedy the conditions causing the removal.
 {¶ 51} In considering the children's best interests, the court stated:
"Colin, Jr. is now seven years old. He has memories of a relationship with his parents. Audrey and Jocelyn have very little in terms of a past relationship with either parent. All of the children's contacts with their parents now have been at the Stepping Stones Visitation Center. Except for an exchange of snacks with the children, there seems to be little involvement between the parents and their children. The children are capable of hearing and speaking. Neither mother nor father have taken any time during their visits to work with the children in sign language or other effective communication methods for hearing impaired parents and children who can hear. Often, the parents remain unaware or unconcerned about the supervision of the children during the visits. At times, they have even looked to visitation monitors to intervene to gain control or to supervise. It is unclear as to whether Jocelyn even knows that Colin, Sr. and [appellant] are her father and mother.
Likewise, there appears to have been little extended family relationships between the children and either mother or father's sides of the family. It appears that Colin, Sr. has little if any relationship with his family. There was no evidence of any significant interaction or relationships between the children and the paternal family. Angela's mother did testify about her positive relationship with her daughter, but offered little evidence concerning her relationship with the children.
On the other hand, Colin, Jr. resides with Carrie Beattie and her husband, who serve as foster parents. She testified that upon his initial arrival, he presented with a number of unacceptable behaviors, such as bed wetting, urinating on the floor instead of the bathroom, overeating, and making inappropriate remarks to her of a sexual nature. All of these things appear to have subsided now and he interacts well with the foster parents and the other children who reside in the home. He is getting A's and B's in his first grade class and is well behaved at school. He seems to be more stable now. He has been receiving some counseling due to a sexual encounter with another child in another foster home. He appears to be adjusting well from that incident. Dr. Ray indicated that any of Colin, Jr.'s emotional issues appear to dissipate the longer he remains with the foster family.
Audrey and Jocelyn reside with Linda Barnes and her husband, as well as ten other children in the home. Upon their arrival to foster care, Audrey seemed to take care of her younger sister, Jocelyn. She did not communicate well and would always point to things. She now communicates and both children interact with everyone in the home in a positive fashion. Audrey and Jocelyn are able to see their brother, Colin, Jr. on a regular basis since the Beatties and Barnes live beside each other. Additionally, Carrie Beattie is the daughter of Linda Barnes.
One of the children, Colin, Jr. did express his wish to the court. As noted, he is seven years old. He is represented by his own legal counsel and a separate guardian ad litem. His interview was conducted in camera. The court does not believe that his maturity is of such a level that his wish is a relevant factor for consideration.
* * *
With regard to the children's custodial history, they have been out of their parent[s'] home for over two consecutive years. Prior to that, they had been temporarily removed from their parents' custody. They have been in primarily the same foster homes over the last two years. The children have been outside more than inside the custody of their parents during their short lives. They have experienced little more than foster care.
Next, the court must examine the child's need for a legally secure permanent placement and whether such placement can be achieved without a permanent custody order. As it was noted earlier, Dr. Christopher Ray testified as to the importance of stability and permanency for Colin, Jr. Likewise, the guardian ad litem has expressed her concerns about the ongoing `limbo' of foster care for the children. Additionally, this court is mindful of the policy advanced by the General Assembly to adopt S.B. 89 in 1988 and H.B. 484 in 1998. Children should not languish in foster care drift. Colin, Jr., Audrey, and Jocelyn need stability as do other children. Their parents have been given amply opportunity to remedy the home conditions. While progress may have been made, the parent[s'] behavior has regressed. As noted above, overwhelming efforts have been devoted by a variety of resources to assist the Berkleys over the last two years. With limited past progress, the court is not convinced that the Berkleys will remedy their homes in a reasonably short period of time such that the children could be permanently stabilized in the parents' home."
The court thus concluded that awarding JFS permanent custody would serve the children's best interests. Appellant filed a timely notice of appeal.
 {¶ 52} In her sole assignment of error, appellant argues that the trial court erred by granting permanent custody to JFS. She asserts that she has undergone "individual and couples counseling with Scioto Paint Valley, and had applied for HUD housing. Both [appellant] and the children have expressed love and affection for one another as evidenced by the visitation notes and the minor child, Colin, Sr.'s [sic] in camera testimony." She claims that she has taken steps to divorce her spouse and that she deserves the opportunity to have a case plan fashioned for her as a single parent. She contends that she should be given additional time to show her ability to effectively parent her three children. We disagree with appellant.
 {¶ 53} A parent has a "fundamental liberty interest" in the care, custody, and management of his or her child and an "essential" and "basic civil right" to raise his or her children.Santosky v. Kramer (1982), 455 U.S. 745, 753, 102 S.Ct. 1388,71 L.Ed.2d 599; In re Murray (1990), 52 Ohio St.3d 155, 156,556 N.E.2d 1169, 1171. The parent's rights, however, are not absolute. Rather, "`it is plain that the natural rights of a parent * * * are always subject to the ultimate welfare of the child, which is the pole star or controlling principle to be observed.'" In re Cunningham (1979), 59 Ohio St.2d 100, 106,391 N.E.2d 1034 (quoting In re R.J.C. (Fla.App. 1974),300 So.2d 54, 58). Thus, the state may terminate parental rights when the child's best interest demands such termination.
 {¶ 54} R.C. 2151.413 permits a public children services agency that has temporary custody of a child to file a motion requesting permanent custody of the child. In considering a motion filed pursuant to R.C. 2151.413, the trial court must follow the guidelines set forth in R.C. 2151.414.
 {¶ 55} R.C. 2151.414(A)(1) requires a trial court to hold a hearing regarding the motion for permanent custody. The primary purpose of the hearing is to allow the court to determine whether the child's best interests would be served by permanently terminating the parental relationship and by awarding permanent custody to the agency. See R.C. 2151.414(A)(1).
 {¶ 56} When considering a motion for permanent custody, a trial court should consider the underlying principles of R.C. Chapter 2151:
To provide for the care, protection, and mental and physical development of children * * *;
* * *
(C) To achieve the foregoing purpose, whenever possible, in a family environment, separating the child from its parents only when necessary for his welfare or in the interests of public safety.
R.C. 2151.01.
 {¶ 57} We note that clear and convincing evidence must exist to support a permanent custody award. The Ohio Supreme Court has defined "clear and convincing evidence" as follows:
"The measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal."
In re Estate of Haynes (1986), 25 Ohio St.3d 101, 103-04,495 N.E.2d 23, 26; see, also, State v. Schiebel (1990),55 Ohio St.3d 71, 74, 564 N.E.2d 54, 60.
 {¶ 58} In reviewing whether the lower court's decision was based upon clear and convincing evidence, "a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." Schiebel, 55 Ohio St.3d at 74. If the lower court's judgment is "supported by some competent, credible evidence going to all the essential elements of the case," a reviewing court may not reverse that judgment. Id.
 {¶ 59} Moreover, "an appellate court should not substitute its judgment for that of the trial court when there exists competent and credible evidence supporting the findings of fact and conclusion of law." Id. Issues relating to the credibility of witnesses and the weight to be given the evidence are primarily for the trier of fact. As the court explained in Seasons CoalCo. v. Cleveland (1984), 10 Ohio St.3d 77, 80, 461 N.E.2d 1273:
"The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony."
 {¶ 60} R.C. 2151.414(B) permits a trial court to grant permanent custody of a child to a children services agency if the court determines, by clear and convincing evidence, that the child's best interest would be served by the award of permanent custody and that one of the following conditions applies:
The child is not abandoned or orphaned or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.
The child is abandoned.
The child is orphaned, and there are no relatives of the child who are able to take permanent custody.
The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999.
 {¶ 61} Pursuant to the plain language of R.C.2151.414(B)(1)(d), when a child has been in a children services agency's temporary custody for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999, a trial court need not find that the child cannot or should not be placed with either parent within a reasonable time. See, e.g., In re Billingsley, Putnam App. Nos. 12-02-07 and 12-02-08, 2003-Ohio-344; In re Williams, Franklin App. No. 02AP-924, 2002-Ohio-7205; In re Dyal (Aug. 9, 2001), Hocking App. No. 01CA11. Thus, when considering a permanent custody motion brought pursuant to R.C. 2151.414(B)(1)(d), the only other consideration becomes the best interests of the child. A trial court need not conduct an R.C. 2151.414(B)(1)(a) analysis of whether the child cannot or should not be placed with either parent within a reasonable time. Dyal, supra.
 {¶ 62} In the case at bar, the trial court determined that R.C. 2151.414(B)(1)(d) applied and the record supports its finding. The court adjudicated Colin, Jr. and Audrey dependent on January 31, 2000 and adjudicated Jocelyn dependent on February 5, 2002. Colin, Jr. and Audrey were removed from their parents' home a second time, and Jocelyn the first time, in November of 2001. For purposes of R.C. 2151.414(B)(1)(d), a child is considered to enter "the temporary custody of an agency on the earlier of the date the child is adjudicated [neglected, dependent, abused, or delinquent] * * * or the date that is sixty days after the removal of the child from the home." R.C. 2151.414(B)(1). Thus, when JFS filed the June 2003 permanent custody motions, the children had continuously been in JFS's custody for well-over twelve months of a consecutive twenty-two month period. The court further found, however, that under R.C. 2151.414(B)(1)(a) the children cannot or should not be placed with either parent within a reasonable time.
R.C. 2151.414(E) sets forth the factors a trial court must consider in determining whether a child cannot or should not be placed with either parent within a reasonable time. See R.C.2151.414(B)(1)(a). If the court finds, by clear and convincing evidence, the existence of any one of the R.C. 2151.414(E) factors, "the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent."
 {¶ 63} A trial court may base its decision that a child cannot or should not be placed with either parent within a reasonable time upon the existence of any one of the above factors. The existence of one factor alone will support a finding that the child cannot be placed with either parent within a reasonable time. See In re William S. (1996), 75 Ohio St.3d 95,661 N.E.2d 738; In re Hurlow (Sept. 21, 1998), Gallia App. No. 98 CA 6; In re Butcher (Apr. 10, 1991), Athens App. No. 1470.
 {¶ 64} In the case sub judice, the trial court found that R.C. 2151.414(E)(1) applied:
"(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.
* * *."
 {¶ 65} Our review of the record reveals that JFS provided the parents with numerous services and ample opportunity to demonstrate their abilities to adequately care for the children and to maintain a safe, stable home environment. JFS and its affiliated workers all testified that appellant understood what was required to have the children returned and that she was capable of understanding, despite her hearing disability. Appellant, however, did not fully remedy the conditions that led to the children's removal. According to JFS caseworkers, she did not demonstrate fiscal responsibility to the extent that she could show that she would budget an appropriate amount of money to provide nutritious food for the children, proper clothing, and other necessities. Furthermore, she did not sufficiently demonstrate that she would be willing or able to maintain a safe, clean, and stable home environment. Testimony exists that appellant did not implement appropriate parenting skills and had little meaningful interaction with her children. Therefore, because either R.C. 2151.414(B)(1)(a) or (d) applies, the only other consideration becomes the children's best interests.
 {¶ 66} R.C. 2151.414(D) requires the trial court to consider specific factors in determining whether the child's best interests would be served by granting the motion for permanent custody. The factors include: (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; (3) the custodial history of the child; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any factors listed under R.C. 2151.414(E)(7) to (11) apply.[1]
 {¶ 67} In the case at bar, we find ample competent and credible evidence to support the trial court's finding that the children's best interests would be served by awarding JFS permanent custody.
 {¶ 68} Regarding the first best interest factor, the interaction and interrelationship between the children and others in their lives, the court found that Colin, Jr. has some memories of the relationship with his parents but that Audrey and Jocelyn have limited memories. During her visitation with the children, appellant often sat on the couch and watched television instead of interacting with the children. She did not display supervisory skills, but instead would look to the visitation monitors to supervise the children or take charge of a situation. She did not take time to teach the children sign language or any other effective means of communication. Although Colin, Jr. lives in a separate foster home from his sisters, the foster homes are adjoining and are within the same extended family. Colin, Jr. thus is able to see his sisters every day. While no doubt exists that appellant loves her children and wishes to have them returned to her, the evidence shows that the children, having been out of her care for approximately two years, currently live in thriving, stable foster homes and that they are well-adjusted to their foster homes.
 {¶ 69} With respect to the second factor, the children's wishes, the court noted that it interviewed Colin, Jr. and that he expressed his desire to live with his parents, but found that he did not possess adequate maturity to render his wishes a sufficiently relevant factor. The court determined that Audrey and Jocelyn were too young for it to consider their wishes.
 {¶ 70} The court also found that the third factor, the custodial history of the children, supported a permanent custody award. JFS has been involved in Jocelyn's life since shortly after her birth, Audrey's life since shortly after her birth, and Colin, Jr.'s life since he was three years old. Both Audrey and Colin, Jr. were temporarily removed from their parents' home before Jocelyn's birth and then returned, only to be removed again. Since the last removal, the three children have continuously been in JFS's custody for over two years. The court found that "[t]hey have experienced little more than foster care."
 {¶ 71} Regarding the fourth factor, the children's need for a legally secure permanent placement and whether such placement can be achieved without a grant of permanent custody, the court found that the children need stability and that appellant, despite some progress and ample opportunity to make progress, has regressed. She has shown that she places her own needs above the children's basic and essential needs and that she at times, appears disinterested. Appellant has had several opportunities and numerous resources available to her so that she could demonstrate her ability to provide an adequate, stable environment for the children. She has demonstrated progress in some areas, but then would not consistently follow the progress she made. The children deserve a stable, safe, and nurturing environment and should not be subjected to appellant's experiments with their welfare. As the court found, and as the record more than amply shows, appellant has had more than enough time to demonstrate her ability to properly care for her children, but either cannot or is unwilling to do so. As one court explained:
"`* * * [A] child should not have to endure the inevitable to its great detriment and harm in order to give the * * * [parent] an opportunity to prove her suitability. To anticipate the future, however, is at most, a difficult basis for a judicial determination. The child's present condition and environment is the subject for decision not the expected or anticipated behavior of unsuitability or unfitness of the * * * [parent]. * * * The law does not require the court to experiment with the child's welfare to see if he will suffer great detriment or harm.'"
In re Bishop (1987), 36 Ohio App.3d 123, 126, 521 N.E.2d 838
(quoting In re East (1972), 32 Ohio Misc. 65, 69,288 N.E.2d 343, 346).
 {¶ 72} Given the amount of time JFS has been involved in the children's lives, the amount of time that the children have been removed from the home, the number of years that appellant has had to demonstrate her parenting abilities, and the number of resources and services provided to appellant, we do not believe that the trial court should have provided appellant with additional opportunities to demonstrate adequate parenting skills. As some point, the focus must be placed on the best interest of the children.
 {¶ 73} Accordingly, based upon the foregoing reasons, we overrule appellant's assignment of error and affirm the trial court's judgment.
Judgment Affirmed.
 JUDGMENT ENTRY
It is ordered that the judgment be affirmed and that appellee recover of appellant costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Pickaway County Common Pleas Court, Juvenile Division, to carry this judgment into execution.
A certified copy of this entry shall constitute that mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Kline, P.J. Deshler,* J.: Concur in Judgment 
Opinion
[1] {¶ a} R.C. 2151.414(E)(7) to (11) provide as follows:
{¶ b} (7) The parent has been convicted of or pleaded guilty to one of the following:
{¶ c} (a) An offense under section 2903.01, 2903.02, or2903.03 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to an offense described in those sections and the victim of the offense was a sibling of the child or the victim was another child who lived in the parent's household at the time of the offense;
{¶ d} (b) An offense under section 2903.11, 2903.12, or2903.13 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to an offense described in those sections and the victim of the offense is the child, a sibling of the child, or another child who lived in the parent's household at the time of the offense;
{¶ e} (c) An offense under division (B)(2) of section 2919.22
of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to the offense described in that section and the child, a sibling of the child, or another child who lived in the parent's household at the time of the offense is the victim of the offense;
{¶ f} (d) An offense under section 2907.02, 2907.03, 2907.04,2907.05, or 2907.06 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to an offense described in those sections and the victim of the offense is the child, a sibling of the child, or another child who lived in the parent's household at the time of the offense;
{¶ g} (e) A conspiracy or attempt to commit, or complicity in committing, an offense described in division (E)(7)(a) or (d) of this section.
{¶ h} (8) The parent has repeatedly withheld medical treatment or food from the child when the parent has the means to provide the treatment or food, and, in the case of withheld medical treatment, the parent withheld it for a purpose other than to treat the physical or mental illness or defect of the child by spiritual means through prayer alone in accordance with the tenets of a recognized religious body.
{¶ i} (9) The parent has placed the child at substantial risk of harm two or more times due to alcohol or drug abuse and has rejected treatment two or more times or refused to participate in further treatment two or more times after a case plan issued pursuant to section 2151.412 [2151.41.2] of the Revised Code requiring treatment of the parent was journalized as part of a dispositional order issued with respect to the child or an order was issued by any other court requiring treatment of the parent.
{¶ j} (10) The parent has abandoned the child.
{¶ k} (11) The parent has had parental rights involuntarily terminated pursuant to this section or section 2151.353
[2151.35.3] or 2151.415 [2151.41.5] of the Revised Code with respect to a sibling of the child.
* Dana A. Deshler, retired from the Tenth Appellate District, sitting by assignment of the Ohio Supreme Court in the Fourth Appellate District.