DECISION AND JUDGMENT ENTRY
{¶ 1} This is an appeal from an Athens County Common Pleas Court, Juvenile Division, judgment that awarded Athens County Children Services (ACCS) permanent custody of Hannah Johnston, born November 28, 2000.
 {¶ 2} Appellant Brandi Bauer, the child's natural mother, raises the following assignment of error for review:
 "THERE WAS NO CLEAR AND CONVINCING EVIDENCE FOR THE COURT TO FIND THAT IT WAS IN THE CHILD'S BEST INTEREST FOR PERMANENT CUSTODY *Page 2 
TO BE GRANTED TO ATHENS COUNTY CHILDREN SERVICES."
 {¶ 3} On May 4, 2004, ACCS filed a complaint that alleged Hannah to be a neglected and dependent child and requested temporary custody. The complaint asserted that appellant is homeless and abuses drugs. On June 17, 2004, the trial court found Hannah to be a dependent child and dismissed the neglect allegation. The court awarded ACCS temporary custody of the child.
 {¶ 4} On March 30, 2005, ACCS filed a motion for permanent custody. On May 17, 2005, ACCS filed a motion to dismiss its permanent custody motion because appellant's mental health counselor advised that appellant's previously undiagnosed and unmedicated schizophrenia may be the result of her inability to comply with the case plan. The counselor stated that appellant may be able to lead a normal life and care for Hannah, with proper medications. ACCS thus requested the court to extend the temporary custody order for an additional six months.
 {¶ 5} On June 1, 2006, ACCS filed a new permanent custody motion. On July 12, 2006, the guardian ad litem recommended that the trial court award ACCS permanent custody. She stated that Hannah's foster parents "are extremely connected to [her] and have built a loving, trusting home where Hannah feels comfortable and safe. Hannah has expressed * * * that she is very happy with her mom and dad. When she was asked to clarify who her mom and dad are, she stated [her foster parents]." The guardian ad litem *Page 3 
stated that before visits with appellant, Hannah "would become extremely anxious, and she would display nervous behaviors such as checking all locks in the house, having nightmares and even wetting the bed. Following the visits Hannah would return to her normal behavior. During the visits Hannah initiated most of the play with [appellant] and spent much of her time trying to amuse Haleigh[1], her younger half-sister. Both [appellant and her boyfriend] did try to assist Hannah in some activities but the majority of the time Hannah would find the activities. Hannah is not bonded with [appellant's boyfriend], and is very timid while in his presence."
 {¶ 6} On July 19, and continuing on August 2 and October 10, 2006, the trial court held a hearing to consider ACCS's permanent custody motion. At the hearing, Tri-County Mental Health and Counseling (TCMHC) Counselor John Casey testified that he began seeing appellant in March of 2005 at ACCS's request. He explained that appellant required approximately six weeks of hospitalization at a mental health hospital, where doctors diagnosed her with "schizophrenia paranoid type and depressive disorder NOS [not otherwise specified]."
 {¶ 7} TCMHC therapist Linda Richardson testified that she counsels Hannah to help her with anxiety issues. She also jointly counseled Hannah and appellant to help Hannah feel bonded to her mother. Appellant stated that she thinks Hannah feels *Page 4 
"ambiguous" towards her mother. She explained: "She is afraid of her at times. I think at this point there's no intimate feelings just from the way she interacts with her." Richardson testified that she believes permanent custody is in Hannah's best interest. She stated that Hannah does not have a strong relationship with her mother and that she has developed "an extremely close strong relationship with the foster parents." Richardson testified that "it would be detrimental to her mental health to move her at this point."
 {¶ 8} ACCS Caseworker Mandy Reuter testified that at the time of the hearing, Hannah had been in foster care for two years. She stated that ACCS decided to seek permanent custody because appellant did not make "substantial enough progress with regards to her mental health. To be able to demonstrate parenting skills that would meet Hannah's social and emotional needs. She also had not been attending visits regularly. There had been numerous missed visits because of other appointments. [Appellant] has a medically fragile child and she also has one that, uh, she's getting ready to birth another one that is medically fragile." She testified that she believed placing Hannah in ACCS's permanent custody serves Hannah's best interests because "it's the only disposition that would allow Hannah to have a safe and permanent home." Reuter stated that the relationship between appellant and Hannah is "strained" and at visits sometimes "there would be no interaction, no exchanging of hellos" and ACCS or the foster parent "would have to encourage Hannah to interact with *Page 5 
[appellant]." Hannah sometimes also "demonstrated fearfulness." Reuter testified that Hannah shares a loving relationship with her foster parents and that she is "very comfortable in the foster home just like a typical child would be in a family environment." She further stated that she does not believe that appellant is capable of caring for Hannah.
 {¶ 9} Reuter explained that appellant's visits with Hannah during the two months immediately preceding the permanent custody hearing were sporadic. Reuter clarified, however, that appellant canceled the visits because she had to take her special needs child, Haleigh, to doctor's appointments in Columbus that were difficult to reschedule.
 {¶ 10} Reuter testified that ACCS did not consider placing Hannah with appellant and her new boyfriend, Gary Carter, because appellant's "mental health is not as stable as it needs to be at this time. They have one special needs child. They also have another special needs child on the way. They have gotten numerous appointments for Haleigh. They have a difficult time even attending the visitation at Children Services. They have not requested any other visitation at Children Services." Reuter admitted that appellant and Carter have been successful in caring for Haleigh, but she also stated that their success is because Carter is Haleigh's primary caregiver. She does not think the two of them can care for Hannah because "Haleigh is a highly specialized needs child. The older she gets the more needs we come to find out that she has. [Appellant] also is pregnant with *Page 6 
another special needs child. * * * It is going to be extremely difficult to manage the two of them let alone a five-year-old too on top of that [who] is extremely intelligent and needs a lot of social and emotional needs."
 {¶ 11} Jennifer Bowie, Hannah's foster mother, testified that she, her husband, her sixteen-month old son and Hannah reside in her home. Hannah has lived with them for most of the past two years. Bowie testified that she kept a record of missed visits and stated that appellant did not attend seventeen of fifty-seven scheduled visits. Bowie also stated that Hannah became fearful and whiney after visiting with appellant. Bowie explained that Hannah "had a lot of defiant behavior acting out against my husband and myself and against the situation. She didn't want to go to the visits and she would barricade herself into a corner during the visit." Bowie stated that Hannah's negative behavior escalated when Hannah began seeing appellant twice per week, once for visitation and once for counseling. Bowie explained that she began wetting the bed and having accidents at school, and that after two to three weeks, Hannah began having nightmares and "almost [an] irrational fear of what she called the bad people coming into our house and taking her." Hannah then began to have trouble interacting with other children at school. After visits with appellant stopped for approximately six or seven weeks, Hannah's negative behaviors ceased.
 {¶ 12} Kali Hitzel, Hannah's guardian ad litem, testified that Hannah stated that she likes living with her foster family and *Page 7 
that she does not know what it would be like to live with her mother. Hitzel stated that she was not clear as to Hannah's wishes, but that she believes that the trial court should award ACCS permanent custody. She does not believe that appellant can properly care for Hannah due to her mental health issues. While Carter and appellant work as a team to care for Haleigh, she does not believe "Hannah has established a bond with [Carter] or a strong enough bond with [appellant] to be able to be placed in their home."
 {¶ 13} On October 24, 2006, after hearing the evidence and counsels' arguments, the trial court awarded ACCS permanent custody. Regarding the child's interaction and interrelationships, the court stated:
 "This five year old has no relationship with her father. He has abandoned her, having no contact since July of 2004. Hannah knows her mother but she is confused about relationships. She realizes that her mother has a newly-born special needs baby (d.o.b. 8-17-05) who is her half sister. Mother has since given birth again to her newest baby (d.o.b. 8-03-06).
 Hannah lives with her foster parents in a loving relationship. They have a fourteen-month old natural son, and Hannah views him as her baby brother."
 {¶ 14} With respect to Hannah's wishes, the court stated:
 "Hannah's wishes are unclear in part because of her age, but also because of the long absence from her mother's home and the sporadic contact with her mother. There have been many missed visits by mother due at least in part to mother's mental health issues and the medical needs of the new babies.
 Hannah has expressed to the guardian ad litem that she wants to continue living with her foster-parents. She also states that she does not know what it would be like to live in mom's family."
 {¶ 15} The court stated as follows regarding the child's *Page 8 
custodial history:
 "Hannah has been in the continuous temporary custody of ACCS since May of 204. She has lived with her current foster parents throughout except for three and one-half months in 2004 when a relative placement was attempted but was unsuccessful. Previously, she was in her mother's care."
 {¶ 16} Regarding the child's need for a legally secure permanent placement, the court stated:
 "Hannah needs and deserves a legally secure placement that can only be achieved with a grant of permanent custody to ACCS and the opportunity for adoption. Hannah has been described as intelligent and insightful and appears to be free of any significant health issues. She has been in counseling for eighteen months primarily related to issues of anxiety regarding her mother.
 [Appellant] suffers from chronic schizophrenia, paranoid type. She also has a depressive disorder, not otherwise specified. The most severe aspects of her condition are hallucinations and paranoia. She experiences a six-week psychiatric hospitalization in 2005. Add to this the recent births of two medically fragile children, and you have a very stressful environment. [Appellant] is living with the father of her new babies. He is believed to be married to someone else but says he is committed to [appellant] and her children. It is likely that his presence in the household and his apparent ability to handle day to day matters is the primary reason ACCS is working with the family to make possible a reunification with the two babies. This man has no legal or moral obligation to Hannah and no history of parenting her.
 [Appellant] has periods of medication compliance, although she acknowledges medication abuse in the past. She sees her counselor regularly, and he has proven to be of great assistance and is a supportive advocate. She will certainly need to continue this appropriate regimen of care to maintain a household for her special needs children." *Page 9 
 {¶ 17} The trial court thus determined that a permanent custody award would serve Hannah's best interests. The court additionally found that Hannah has been in ACCS's temporary custody for twelve or more months of a consecutive twenty-two month period. This appeal followed.
 {¶ 18} In her sole assignment of error, appellant argues that clear and convincing evidence does not support the trial court's decision awarding ACCS permanent custody. We disagree with appellant.
 {¶ 19} A parent has a "fundamental liberty interest" in the care, custody, and management of his or her child and an "essential" and "basic civil right" to raise his or her children. Santosky v.Kramer (1982), 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599;In re Murray (1990), 52 Ohio St.3d 155, 156, 556 N.E.2d 1169. A parent's right is not absolute, however. Rather, "`it is plain that the natural rights of a parent * * * are always subject to the ultimate welfare of the child, which is the pole star or controlling principle to be observed."" In re Cunningham (1979), 59 Ohio St.2d 100, 106,391 N.E.2d 1034 (quoting In re R.J.C. (Fla.App. 1974), 300 So.2d 54, 58). Thus, the state may terminate parental rights when the child's best interest demands it.
 {¶ 20} R.C. 2151.413 permits a public children services agency that has temporary custody of a child to file a motion to request the child's permanent custody. In considering a R.C. 2151.413 motion, a trial court must follow the guidelines set forth in *Page 10 
R.C. 2151.414.
 {¶ 21} R.C. 2151.414(A)(1) requires a trial court to hold a hearing regarding the permanent custody motion. The primary purpose of the hearing is to allow the court to determine whether the child's best interests would be served by permanently terminating the parental relationship and by awarding permanent custody to the agency. See R.C.2151.414(A)(1)
 {¶ 22} When considering a request for permanent custody, a trial court should consider the underlying principles of R.C. Chapter 2151:
 To provide for the care, protection, and mental and physical development of children * * *; * * *
 To achieve the foregoing purpose[ ], whenever possible, in a family environment, separating the child from its parents only when necessary for his welfare or in the interests of public safety.
R.C. 2151.01. Additionally, clear and convincing evidence must exist to support a permanent custody award. The Ohio Supreme Court has defined "clear and convincing evidence" as follows:
 "The measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal."
In re Estate of Haynes (1986), 25 Ohio St.3d 101, 103-04, 495 N.E.2d 23; see, also, State v. Schiebel (1990), 55 Ohio St.3d 71, 74,564 N.E.2d 54. In determining whether a trial court's decision is based upon clear and convincing evidence, "a *Page 11 
reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." Schiebel, 55 Ohio St.3d at 74. If a trial court's judgment is "supported by some competent, credible evidence going to all the essential elements of the case," a reviewing court may not reverse that judgment. Id. Moreover, "an appellate court should not substitute its judgment for that of the trial court when there exists competent and credible evidence supporting the findings of fact and conclusion of law." Id. Generally, issues relating to the credibility of witnesses and the weight to be given the evidence are primarily for the trier of fact. As the court explained in Seasons Coal Co. v. Cleveland (1984),10 Ohio St.3d 77, 80, 461 N.E.2d 1273: "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony."
 {¶ 23} R.C. 2151.414(B)(1) permits a trial court to grant permanent custody of a child to a children services agency if the court determines, by clear and convincing evidence, that the child's best interest would be served by the award of permanent custody and that one of the following conditions applies:
 (a) The child is not abandoned or orphaned or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999, and the child cannot be placed with either of the *Page 12 
 child's parents within a reasonable time or should not be placed with the child's parents.
 (b) The child is abandoned.
 (c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.
 (d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999.
 {¶ 24} Thus, pursuant to the plain language of R.C. 2151.414(B)(1)(d), when a child has been in a children services agency's temporary custody for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999, a trial court need not find that the child cannot or should not be placed with either parent within a reasonable time. See, e.g., In re Billingsley, Putnam App. Nos. 12-02-07 and 12-02-08, 2003-Ohio-344; In re Williams, Franklin App. No. 02AP-924, 2002-Ohio-7205; In re Dyal (Aug. 9, 2001), Hocking App. No. 01CA11. Consequently, when considering a R.C. 2151.414(B)(1)(d) permanent custody motion, the only other consideration becomes the child's best interests. A trial court need not conduct an R.C. 2151.414(B)(1)(a) analysis of whether the child cannot or should not be placed with either parent within a reasonable time.Dyal; see, also, In re Berkley, Pickaway App. Nos. 04CA12, 04CA13, and 04CA14, 2004-Ohio-4797, at ¶ 61.
 {¶ 25} In the case at bar, Hannah was in ACCS's custody for more than twelve months of a consecutive twenty-two month period. *Page 13 
The trial court adjudicated her dependent on June 17, 2004. For purposes of R.C. 2151.414(B)(1)(d), a child is considered to enter "the temporary custody of an agency on the earlier of the date the child is adjudicated [neglected, dependent, abused, or delinquent] * * * or the date that is sixty days after the removal of the child from the home." R.C.2151.414(B)(1). Thus, when ACCS filed its June 2006 permanent custody motion, Hannah had been in its custody for almost two years, which far exceeds twelve months of a consecutive twenty-two month period.
 {¶ 26} R.C. 2151.414(D) requires a trial court to consider specific factors in determining whether a child's best interests would be served by granting a motion for permanent custody. The factors include: (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; (3) the custodial history of the child; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any factors listed under R.C. 2151.414(E)(7) to (11) apply.
 {¶ 27} In the case sub judice, our review of the record reveals (1) ample competent, credible evidence to support the trial court's decision to award Hannah's permanent custody to *Page 14 
ACCS and (2) that this decision serves Hannah's best interests. First, Hannah's interaction and interrelationships with others supports the trial court's best interests finding. Hannah lives in a loving foster home and thinks of her foster parents as her "Mom" and "Dad." She interacts wells with the family and shares a strong bond with them. In contrast, Hannah had difficulty interacting with her mother during visits and ample evidence exists that Hannah does not share a strong bond with her mother or her mother's boyfriend. Second, regarding Hannah's wishes, as the trial court noted, Hannah's wishes are unclear. We note, however, that the guardian ad litem recommended that the court award ACCS permanent custody. Third, with respect to Hannah's custodial history, the evidence reveals that she has been in ACCS's custody since she was approximately three and one-half years old. By the date of the last phase of the permanent custody hearing, in October of 2006, Hannah had been out of her mother's care for approximately two and one-half years. Fourth, Hannah needs a permanent, secure home, which appellant cannot provide. Appellant's mental health and the medical needs of her two younger children interfere with her ability to properly care for Hannah. Additionally, we note that at the final permanent custody hearing, appellant's landlord testified that ACCS had removed appellant's two younger children from the home.[2] Consequently, we believe that the record contains ample *Page 15 
competent, credible evidence to support the trial court's finding that awarding ACCS serves Hannah's best interests.
 {¶ 28} Accordingly, based upon the foregoing reasons, we hereby overrule appellant's sole assignment of error and affirm the trial court's judgment.
JUDGMENT AFFIRMED.
 JUDGMENT ENTRY
It is ordered that the judgment be affirmed and that appellee recover of appellant costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Athens County Common Pleas Court, Juvenile Division, to carry this judgment into execution.
A certified copy of this entry shall constitute that mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
 Harsha, J. Kline, J.: Concur in Judgment Opinion *Page 16 
[1] A few places in the record depict the child s name as "Hayleigh." We have used the spelling that appears in the permanent custody hearing transcript, "Haleigh."
[2] The record, however, does not reveal the reasons for the children's removal. *Page 1